ANGLO–SAXON PETROLEUM CO., Limited of London, England v. UNITED STATES (two cases).

UNITED STATES v. The GOLDSHELL.

THE WHITE PLAINS.

United States District Court, S. D. New York.

Nov. 5, 1951.

Herbert P. Reid, New York City, Proctor for libellant and cross-respondent.

Irving H. Saypol, U. S. Atty., New York City (L. J. Curren, New York City, of counsel), for respondent and cross-libellant.

CONGER, District Judge.

There are three actions being tried here. In two, The Anglo-Saxon Petroleum Co., Ltd. is the libellant and the United States of America is the respondent. In the other, the United States of America is the libellant and The Anglo-Saxon Petroleum Co., Ltd. is the respondent.

One of the suits filed by The Anglo-Saxon Petroleum Co., Ltd. was brought pursuant to the provision of the Suits in Admiralty Act of 1920, 46 U.S.C.A. § 741 et seq.; the other pursuant to the Public Vessels Act of 1925, 46 U.S.C.A. § 781 et seq.

It was stipulated by counsel for the Government that the S. S. White Plains at the time of the collision was a merchant vessel of the United States and sueable under the "Suits in Admiralty Act." In view of that admission, the suit under the "Public Vessels Act" was abandoned and the trial proceeded on the original suit filed under the "Suits in Admiralty Act."

The suit commenced by libellant The Anglo-Saxon Petroleum Co., Ltd. under the "Public Vessels Act" is dismissed without costs.

The remaining two actions were consolidated for all purposes.

It was further stipulated that the ownership of the respective vessels is as alleged in the pleadings and that both vessels sustained damage as a result of the collision.

Each libellant in the two remaining suits is asking damages for the injury to its vessel occurring because of a collision between the two vessels.

The vessels involved are the Goldshell owned and operated by Anglo-Saxon and the White Plains owned and operated by the U. S. A.

These two vessels collided in the Hudson River approximately abreast of Pier 22 in the early morning of December 10, 1942. The Goldshell was coming in from the sea, proceeding northerly up the Hudson River, intending to anchor near Yonkers.

The White Plains was proceeding out to sea and down the Hudson River. She had been lying at Pier 62, north of the place of the collision, and was undocked with the assistance of tugs, somewhere in the river and swung around bearing south and proceeded down the river.

Both vessels collided somewhere in the river about opposite Chambers Street, New York City. The stem of the White Plains came in contact with the port bow of the Goldshell where the hawse pipe is located.

Both vessels were in the ballast. The Goldshell, a twin-motored diesel vessel, was 457.2 feet long and 62.1 feet beam and 34.1 in depth. The White Plains, a turbo-electric driven ship, was 523 feet long, 68 feet beam and 39.3 in depth. Each vessel at the time of the collision was in charge of and being piloted by a licensed Sandy Hook Pilot.

To fix the responsibility for the collision the Court is faced, as is quite common in these cases, with conflicting testimony which may not be reconciled. Much of this conflicting testimony is found in depositions so that the Court did not have the advantage of seeing these witnesses and evaluating their testimony by the usual tests.

The most important fact to be determined is just where in the river did this collision occur. Here, one finds a wide variance. If full credit be given to the story as related by each side, the collision could not have occurred. The vessels would have been too far apart. The Court then has to pick out various pieces of testimony which it believes to be true, reasonable and probable and fit them together. This, I have done in this case in order to arrive at what I believe to be the correct answer, and I have come to the conclusion that those in charge of the White Plains were responsible for this collision because she was proceeding down

the river in a heavy fog well on the wrong side of the river.

The story told by the Pilot of the Goldshell and by others of her personnel was that the Goldshell was proceeding up the river on a course parallel to the New York pier ends at a distance estimated to be about 600 feet therefrom. It is contended by those who were on the White Plains that she was out docked in the middle of the river and proceeded down either in the middle of the river or a little to the west of the center line of the river favoring the Jersey side.

However, those of the White Plains' personnel who testified were not in accord. Several of them did testify that the White Plains was placed by the tugs in about the middle of the river favoring the Jersey side, and that she started down and did not deviate in her course. However, there is sufficient testimony contra on the part of those on the White Plains to cast a doubt on this testimony. Lindquist, Junior Third Mate of the White Plains, did not know on which side of the river they went down.

The Captain of the White Plains who was on the bridge at the time testified that he could not tell in what part of the river the collision took place; that at the time of the collision he could only see about a ship's length; and he further testified on cross-examination as follows:

"Q. Now, would it be fair to say that when you were either half ship's length or ship's length clear of the pier when your bow was clear of the end of the pier, that then you started turning around to head south? A. With the assistance of the tug.

"Q. So that when you were heading south, or down river, just before the tugs left, would it be fair to say that you were within a ship's length of the head of the pier at that time? A. Apparently.

"Q. And that would be about the length of your ship, 523 feet? A. Yes, sir.

    *   *   *   *   *   *

"Q. Now I think you said during your direct testimony, that you couldn't see the Jersey side of the river, but you could see the New York side of the river; isn't that correct? A. Shortly after we left the pier, yes.

"Q. That is when you got out in the river and headed south, you could see the New York side, but you couldn't see the Jersey side? A. Yes, sir."

Chief Mate Kershaw of the White Plains on direct examination testified that when the White Plains started out she was in mid-channel or possibly favoring the New York side. Later on cross-examination he testified as follows:

"Q. Well, wouldn't it be fair to say that when she straightened out to head downstream, that she wouldn't be more than a ship's length or a ship's length and a half from the end of the pier? A. Yes, that would be a fair statement."

It is very pertinent that some of the men on the White Plains testified that as they came down the river they could see the New York shore but not the Jersey shore.

From the compass readings it would appear that the White Plains on her way down progressed in almost a straight course with no appreciable deviation.

I can only conclude that the White Plains started on her journey not in the middle of the river but much nearer to the New York shore.

On the part of the White Plains it is contended that a sudden bank or cloud apparently compounded of smoke and mist enfolded the Goldshell and assailed the White Plains just prior to the collision. Testimony on both sides contradicted this contention. Those on the Goldshell testified when they left the anchorage it was clear but that as they entered the river the visibility was decreasing as they went along, and at about 7:18 a. m. or shortly thereafter the visibility was down to about 500 feet.

As another witness, one of the men on the Goldshell, put it, at about a point abreast of pier 8 or 9 dense fog conditions were experienced limiting visibility to something between 600 and 1,000 feet and thereafter regulation fog signals were continually sounded and that after so proceeding through the dense fog for a period

of about 10 minutes the Goldshell arrived at about the place where the collision occurred.

The story told by those on the White Plains differs on this point. However, Gallagher, a man who had a long experience on the water in and about New York Harbor and the lower Hudson, and who was on the White Plains as the bow lookout as she came down the river, testified: "A. * * * After we started down a little, it seemed to fog right up and the visibility got very poor. You couldn't see the length of the ship."

Captain Alexander of the White Plains testified that at the start visibility was poor, smoky air and got worse when they got farther down; that they proceeded with caution seeing the weather was getting thicker all the time.

The Daily Local Record of the U. S. Department of Commerce, Weather Bureau, was offered in evidence. This showed the weather conditions in New York on December 10, 1942. The record was made at 17 Battery Place, not far from the place where this collision took place. This record indicated as follows: "Light fog continued from midnight to 6:30 A.M. then moderate fog to 6:45 A.M. Thick fog to 7:15 A.M. Dense fog to 8:55 A.M."

The vessels came together at about 7:33. At that time the fog was so dense that neither vessel was seen by the other until they were almost in collision. The consensus of the testimony is that they were approximately a ship's length apart when each saw the light of the other [500 to 530 feet]. It is hard to tell from the testimony at what angle they came together. The versions varied. It is not too important since I have come to the conclusion that this collision occurred because the White Plains was proceeding south, well on the wrong side of the river in a dense fog, and did collide with the Goldshell, which at the time was proceeding north well on her own side of the river. For this fault she must be held liable here.

■ There is complaint that one or both of these vessels was operating at a speed which was excessive under the circumstances. Without going into detail I find that this was not so.

■ On the part of the Goldshell it is contended that the White Plains was not, as she was required to do under the circumstances, sounding fog signals. The testimony on this point is contradictory. The men on the White Plains were not in accord in their testimony. Some said the fog whistles were being sounded before the collision. Pilot Gallagher on the White Plains said that he sounded no fog signals before the collision and that if any of the men on the White Plains said that they were so blown" * * * they were in a little error before and after the collision there."

However, Jackson, the Second Officer of the White Plains testified that before the collision he, himself, was sounding the fog signals [one prolonged blast every minute]. He is corroborated by Eagle, Third Officer of the Goldshell, who testified that he heard a fog signal of a vessel slightly on the port bow of the Goldshell at 7:29 and thereupon the engines of the Goldshell were stopped and a keen lookout kept all around to see if the lights of the ship could be picked up and that shortly thereafter at 7:31 a green light was sighted about 2 points off the port bow. This turned out to be the green light of the White Plains. Pilot Egan of the Goldshell testified he heard this whistle off the port bow just before he saw the green light of the White Plains. He would not identify it as a fog signal but stated that it served the same purpose in telling him that there was a vessel there in the vicinity. There is evidence from which one might infer the fog signals were being sounded from the White Plains before the collision.

■ As I see it, however, failure to blow fog signals by the White Plains in no way contributed to the accident. One whistle at least was blown. It should be noted in this connection that it was the unanimous testimony of those on the Goldshell that her fog signals were being sounded for 10 minutes before the collision and yet they were not heard by any one on the White Plains.

■ Two faults may be recorded against the White Plains. For a period which might be estimated up to at least 16 minutes to the knowledge of her navigating pilot, she was proceeding with her masthead light unlighted.

■ In addition, the vision from the navigating bridge was seriously obstructed by reason of certain cargo which was loaded on the forward deck and by the gun tub on the forecastle head.

■ These, indeed, were faults but I feel that these conditions contributed only slightly, if at all, to the collision. As I have said before, in my opinion this collision was caused by the negligence of those in charge of the White Plains in navigating her down the river in a dense fog on the wrong side of the river.

I doubt very much that the collision could or would have been avoided had the masthead light been lighted or the vision from the navigating bridge been unimpaired.

Judgment for the libellant The Anglo-Saxon Petroleum Co., Ltd. of London for the damage to the Goldshell.

Settle decree on notice.